UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,     CASE NO. 1:22-CR-20238

v.

COLBURN LAMAR     DISTRICT JUDGE THOMAS L. LUDINGTON
WICKER, II     MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
### (ECF No. 21)

**I.  Background**

Defendant filed the instant motion to suppress on November 15, 2022. (ECF No. 21.) Government counsel responded on December 6, 2022. (ECF No. 24.) An evidentiary hearing and oral argument was held on December 20, 2022.

At the hearing, several stipulations were made at the outset. All agreed that the search of Defendant's vehicle was without a warrant. The government agreed that it has the burden to show an exception to the warrant requirement applies and counsel indicated it was contending that the plain view exception in conjunction with the automobile exception applied in this case.

**II.  Governing Standards**

1

"The government bears the burden of demonstrating an exception to the warrant requirement." *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002). In order for evidence to fall within the plain view exception, it must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994). "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitee passersby or diligent police officers.'" *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (citations omitted).

In assessing whether the incriminating character of an object is immediately apparent, the court is guided by the following factors, none of which are required: (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the objects on the facts then available to them determine probable cause of the object's incriminating nature." *United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2019) (quotations omitted).

The automobile exception allows an officer to search an automobile's passenger compartment for weapons if he or she "possesses a reasonable belief based on

'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1036 (1983) (quoting *Terry v Ohio*, 392 U.S. 1, 21 (1968). "Furtive movements made in response to a police presence may…properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (collecting cases upholding protective search of area where furtive movements were directed and pat downs).

### III. Factual summary from the evidentiary hearing

The first witness called was Trooper Dehmel. He testified that on April 15, 2022, around 10:30 p.m., he and his partner Andrew Morse were sitting in the area of Wolcott and Webber Streets in Saginaw, Michigan. He observed a car that continued to drive in an area with traffic with his bright lights on and tinted windows that each violated Michigan traffic laws (civil infractions). When the vehicle was stopped, the dash camera and microphone were turned on, one person was observed inside the vehicle (Defendant) and Trooper Dehmel noticed him making furtive movements toward the center of the vehicle. Trooper Dehmel approached the driver's side and Trooper Morse approached the passenger side.

Trooper Dehmel testified that the officers usually split up so they can each view the person and can better look for anything that could harm them, i.e., for the

safety of the officers. Trooper Dehmel asked Defendant for his license, registration, and proof of insurance. Defendant provided his license and registration but did not have proof of insurance although he indicated he did carry insurance for the vehicle. Trooper Dehmel asked Defendant if he had any weapons and whether Defendant had been arrested before. Defendant indicated that he had been arrested for CCW (carrying concealed weapon). Defendant also answered that he was not on probation but had been on probation after serving prison time. Trooper Dehmel noted that if Defendant did not carry insurance coverage, that would be a criminal offense but if he had insurance but simply lacked proof of insurance, that would constitute a civil infraction.

    While Defendant continued to look for proof of insurance on his cellphone, the Troopers returned to the patrol car and muted the microphone which is their normal practice when having a private conversation. The Troopers also began searching the Secretary of State (SOS) website to determine whether there was insurance coverage on the vehicle. While inside the vehicle Trooper Morse told Trooper Dehmel that he thought he saw the edge of a magazine for a firearm in the console between the driver and passenger seats of the vehicle. The SOS search indicated that there was no insurance coverage on the vehicle. The Troopers reapproached the vehicle and found Defendant still scrolling on his cellphone, using Facebook Messenger. Trooper Dehmel asked for consent to search the vehicle and

4

Defendant declined. Trooper Dehmel had some doubt about what was in the console at that time. Although he saw that it was partially open, could not really see what was there.

Trooper Dehmel asked Defendant to step out of the vehicle because of the finding of no insurance. Defendant protested and repeated that he knew he had insurance. Then Trooper Dehmel conducted a pat down of the Defendant, finding nothing on his person. At that point, Trooper Dehmel had a much fewer safety concerns because Defendant had been separated from the vehicle. At this point, Defendant pulled up a proof of insurance on his Facebook messenger account, which Trooper Dehmel thought was odd that Facebook Messenger would have such information.

Trooper Dehmel testified that once Defendant was out of the vehicle, it was easier to see the console, especially from the passenger side, where he saw the clear edge of a magazine and the brass round of it indicating it was loaded.

Trooper Dehmel indicated that even if proof of insurance was shown to him, Defendant would not have been free to leave because the next step would have been to call the Defendant's insurance company to verify insurance coverage.

Trooper Dehmel then asked Defendant to own up and tell him what was in the center console, Defendant did not. Trooper Dehmel was confident the item was a magazine, so he asked for consent to search the vehicle, which Defendant declined

to give. Trooper Dehmel told Defendant he saw a magazine in the console, that he was going to search the vehicle, and he then began searching the vehicle. Once inside the vehicle, Trooper Dehmel saw the console was partially open because the drum magazine was too big to fit in it, the magazine was loaded, and the top brass casing was visible. A handgun was also discovered under the driver's seat. Exhibit 1, a photograph of the drum magazine, bullets, and handgun, was entered into evidence.

At this point the dash camera (dashcam) video was played showing the approximately eight minutes that corresponded to the portion of the stop at issue. The dashcam video was consistent with Trooper Dehmel's testimony generally but did add some information. For instance, a third person was on the scene, Trooper Stinson, a canine officer without his dog, was also present and was also zealously looking into the passenger's side of the vehicle. In addition, the video showed all three officers looking intently into the vehicle whenever possible, i.e., whenever not doing something else.

On cross-examination, Trooper Dehmel testified that Defendant's furtive movements involved him moving his shoulder to the center of the vehicle. Trooper Dehmel agreed that it was "possible" that such movements were for the purpose of finding his registration which was located in the glovebox of the vehicle. Trooper Dehmel also clarified that when the Troopers returned to the patrol car and turned off the microphone, this conversation lasted around 14 seconds. Trooper Dehmel

6

indicated that the microphone is turned off during private conversations. However, he also stated that during that time, Trooper Morse told Trooper Dehmel he thought he saw a magazine in the console, and even though the conversation was no longer private, Trooper Dehmel did not turn the microphone back on until they left the patrol car. Trooper Dehmel acknowledged that this conversation would have been helpful to this plain view exception discussion. Trooper Dehmel conceded that his partner indicated he wasn't sure—because he wasn't able to see the magazine well because Defendant had his arm/elbow leaning on the console, causing it to remain more closed than it would have been without any pressure on it.

On redirect examination, Trooper Dehmel clarified that he did not search the vehicle because of what his partner had told him.

Trooper Morse testified in a manner consistent with Trooper Dehmel generally but also added some information about the events. Trooper Morse testified that when Officer Stinson arrived, trooper Morse told him to watch the vehicle and that there was "one" in the center console. The term "one" generally refers to a firearm or something like that. Trooper Morse testified that he believed that he saw a pistol magazine in the console but was "slightly unsure, not confident." He did not search the vehicle immediately because he was not sure. Trooper Morse stated that once Defendant was removed from the vehicle for failure to show insurance coverage, he could now see the console better because it had "popped back up" so he could see

7

the top of a pistol magazine and brass round. Trooper Morse also testified that once Defendant was removed from the car, any safety concerns lessened "absolutely." On cross-examination, Trooper Morse clarified that the console was open a couple inches initially, then when Defendant leaned on it he couldn't see much of anything, then when Defendant was removed from the vehicle he could see the same couple of inches as he had before Defendant leaned on it.

### IV. Analysis

From the above testimony, the Court finds that the automobile exception is not implicated on the instant facts. At the time of the search, both Trooper testified they did not have any heightened safety concerns, the dashcam shows the Troopers did not behave as if they were in fear, and government counsel conceded there were really no safety concerns once Defendant was removed from the vehicle.

Therefore, this Court's focus, and the focus of the parties, remains with the plain view exception. As noted during oral argument, the defense's challenge regards whether the object was in plain view. The defense does not challenge that the incriminating nature would have been known, likely because Trooper Dehmel's testimony established that he knew Defendant was a convicted felon who could not lawfully possess firearms or ammunition based on Defendant's statements about his past record. *See United States v. Richardson*, No. 8:19-CR-00182, 2020 WL

4060553, at *5 (C.D. Cal. July 20, 2020) (incriminating nature of the magazine was immediately apparent because of Defendant's statement that he was a felon).

Most salient to the issue of whether the magazine was seen and identified as a magazine for a firearm from where the Troopers were standing outside the vehicle is Trooper Morse's testimony, since he was the one who first indicated that he thought the item in the console was a magazine. Although he initially testified that after Defendant was removed from the vehicle, he could now see the console better because it had "popped back up" so he could see the top of a pistol magazine and brass round. He later clarified, on cross-examination, that before and after Defendant leaned on the console, he could see a couple of inches of the item that was keeping the console from closing completely, i.e., the magazine. Thus, his view was essentially no better after Defendant was removed from the vehicle as it was before he was removed from the vehicle (when he was not leaning on the console). Before Defendant was removed from the vehicle, he indicated he was "slightly unsure, not confident." He did not search the vehicle at that time because he was not sure.

In the context of the plain view exception, "'probable cause exists when the incriminating character of [the] object is immediately apparent to the police.'" *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011) (citations omitted). Officers "need not be certain of the incriminating character of an object, but rather, must have a belief based on a 'practical, mechanical probability' that the object is

9

evidence of a crime." *Id.* Here, the Troopers were aware Defendant was a felon so if the item was a firearm or ammunition, it would be unlawful for Defendant to possess it. Instead, the question is whether they had probable cause to believe it was ammunition.

It could be questioned that if Trooper Morse's view was the same after Defendant was removed from the vehicle as it was before, why did his confidence level increase so much upon the second viewing. Stated another way, if he lacked probable cause before, and the view was the same after Defendant was removed from the vehicle, did he lack probable cause then also?

However, in viewing the totality of the circumstances, all three law enforcement officers at the scene thoroughly looked into the car, especially from the passenger's side, and Defendant appeared to be leaning on the console to place pressure on it, likely to avoid the item from being seen. At the time of the search, Trooper Morse was confident he had seen the top of a pistol magazine and brass round and Trooper Dehmel had told Defendant he saw a magazine in the console. These Troopers are experienced and very familiar with firearms and ammunition. Trooper Morse believed it was a magazine from his first glance. Perhaps probable cause existed at that moment. Probable cause should not be undermined by the Troopers taking some additional time to look and confirm what Trooper Morse thought he saw initially.

10

I therefore conclude that the drum magazine was in plain view, i.e., that probable cause to believe it was a magazine containing ammunition existed. Therefore, Defendant's motion is **DENIED**.

IT IS SO ORDERED.

Review of this order is governed by 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and E.D. Mich. LR 72.1(d).

Date:  December 22, 2022                                  s/ Patricia T. Morris
                                                          Patricia T. Morris
                                                          United States Magistrate Judge